In the INTEREST OF D.P. and H.P., Children.

C.P., Father, Appellant,

v.

STATE of Iowa, Appellee.

No. 87–1316.

Supreme Court of Iowa.

Nov. 23, 1988.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Valencia Voyd McCown, Asst. Atty. Gen., and Terry L. Ladwig, Asst. Co. Atty., for the State.

Daniel C. Galvin, Sioux City, for the father.

Rosemary Sheehan of Crary, Huff, Clem, Raby & Inkster, P.C., Sioux City, guardian ad litem and for the children.

Considered by LARSON, P.J., and SCHULTZ, CARTER, SNELL and ANDREASEN, JJ.

SCHULTZ, Justice.

The father of two children appeals from the juvenile court order terminating his parental rights. The mother of the children does not appeal from the termination of her rights. We transferred this case to the court of appeals, which reversed the juvenile court ruling, holding instead that there is not clear and convincing evidence that the children cannot be returned to their father. We granted the application for further review filed by the State and the attorney and guardian ad litem for the children. We vacate the decision of the court of appeals and affirm the judgment of the juvenile court.

The children were adjudicated children in need of assistance pursuant to section 232.-96 [1] (CHINA) on June 21, 1984. The State's petition for termination of parental rights was filed on January 22, 1987, pursuant to section 232.116(5). This subsection permits termination when the court finds three events have occurred. First, the child was adjudicated by clear and convincing evidence in need of the court's assistance. *See* § 232.96. Second, the custody of the child has been transferred from the parents for at least twelve of the last eighteen months pursuant to section 232.-102. This section requires that the child be left in the home whenever possible, but allows the court to remove the child if it finds by clear and convincing evidence that the child cannot be protected from physical abuse or some other harm which would justify protection under a CHINA proceeding. *Id.* In such an adjudication the court is required to state that the welfare of the child requires a removal from the parent's home and reasonable efforts have been made to eliminate the need for the child's removal. *Id.* Third, there is clear and convincing evidence that the child cannot be returned to the parent under the standards of section 232.102.

---

1. All references in this opinion to sections are contained in Iowa Code chapter 232 (1985).

A removal of the child from the parent's home requires affirmative measures by the department of human services (department) and the court. After the initial removal, the department or other agency is responsible for making efforts to return the child to the home. § 232.102(5). The court is required to monitor the placement and hold review hearings every six months. § 232.102(6). The court may decide whether the child should be returned to the parent, requires additional services to facilitate the return of the child to the parent or if termination proceedings should be instituted. *Id.*

No complaint has been made that the court or the department did not follow the proper procedures or fulfill their statutory duties. We now turn to the events that transpired leading to the eventual termination of parental rights.

The children in this case are siblings, a boy born in 1982 and a girl born in 1983. Their parents were married to each other at the time of the children's births.

The mother has lived most of her life in Woodbury County. She has serious emotional problems.

The father was born in another state. He indicated that his mother gave him away at a young age and that his father did not want to care for him. He did live with his father for a year and a half when he was about 14 and was physically abused by him. He was raised by his great-grandmother, who died when he was 17. He stated he then took to the streets. He lived at a Gospel Mission and eventually joined the Job Corps. He received a GED high school degree and attended college for about one year.

After some years of wandering, the father stopped in Sioux City and became employed. During this time, he met his future wife. They were married after she became pregnant. After the child was born, he was unemployed. He maintains that his mother-in-law convinced him to live on aid-to-dependant-children payments. The marriage was dissolved in December of 1984. He has been employed in Souix City since that time.

This family first came to the attention of the authorities in January of 1984. The maternal grandmother had called the police because the boy had been beaten by the father. The injuries sustained by the boy included bruises to his buttocks, lower back and face. The department initiated services for the family, including marital counseling, parenting counseling and homemaker services. A second abuse report was made concerning the mother pulling out the little girl's hair. Soon afterward, the mother attempted suicide. Both the mother and father were hospitalized for mental treatment.

On June 4, while the mother was on leave from the hospital, the parents had the children in a local shopping mall, along with the mother's boyfriend. The boyfriend was also a patient at the same hospital. Apparently after the father left the mall, another child abuse incident was reported to the police. Several people had reported that the mother was mistreating her son. The police discovered that the son had several marks on his face and bruises on his upper and lower back. The father subsequently admitted that the bruises on the boy's back were the result of beating the boy twice with his hand. The father stated he hit the child because he had been eating paint. The reason that he did not hit him on the buttocks was because the child's diaper was full. The father also indicated that his wife was still yanking out the girl's hair.

Following this incident, CHINA proceedings were initiated and temporary custody of the children was placed in the department. In August 1984, a dispositional hearing was held which determined that temporary care and custody of the children were to be continued in the department for placement in foster care. The children have remained in foster care in three different homes since that time.

Since the initial dispositional hearing, reviews have occurred on several occasions in 1985 and 1986. The result of the first dispositional hearing allowed the parents supervised visits with the children and provided homemaker services, psychiatric

counseling and educational training for the mother. During 1985, the father was involved in homemaking services and parenting classes.

In the summer of 1985, unsupervised visitations between the father and the two children were initiated. The children were found to have bruises and lacerations following the unsupervised visitations. The father and the foster parents each claimed the other was responsible. The foster mother requested removal of the children due to these accusations, which was granted. The unsupervised visitations were discontinued until February of 1986, when they were resumed. The children had unfavorable reactions to the unsupervised visitations and they were again discontinued in March. During supervised visitations, the father continued to exhibit inappropriate parenting techniques and had little interaction with the children.

The mother of the children was also allowed visitation with the children. In the summer of 1985, she stated she wanted no more visits with the children. She has been involved with another man and a child from that relationship has also been removed from her custody by court action because of abuse. She does not contest termination of her parental rights to these children.

In January of 1987, a petition for termination of parental rights was filed. After a hearing, the juvenile court found that the parental rights of both parents should be terminated. The court found that the children had been removed from the home because of physical abuse to the son by both parents.

The court reviewed the facts concerning the efforts made by the father to improve his fathering skills. It found that despite all of the services provided to the parents, the father "has both verbalized and exhibited unsafe, and bizarre parenting techniques and behavior in the presence of the children." After viewing the videotape of certain visitations, the court found that the father's relationship with the children "was one of reaction rather than interaction." It reviewed the father's good points and found that he demonstrated affection toward the children in supervised situations. However, the court found that he "has been unable to exhibit parenting abilities necessary to address even the minimal physical and emotional needs of the children, notwithstanding the myriad of services which have been provided to him."

The court made findings of fact concerning the best interest of the children. It found the children sometimes had an adverse reaction to the visitations. The court found they continued to thrive in foster care, but they needed some type of permanency in their lives. The court concluded that the parental rights of both parents should be terminated.

On appeal, the father does not challenge the CHINA adjudication nor the period or the propriety of the placement under section 232.102. Rather, he limits his attack to the finding that there was clear and convincing evidence to justify the termination of his parental rights. The crux of his attack points to the third element of proof, the question of whether the state has met its burden of proof that the children cannot safely be returned to their father.

The father thereby raises several claims. He maintains that the children's emotional and behavioral problems were not his fault and lays part of the blame on the changes in foster homes. He challenges the credibility of the social worker who had the most contact with him. He maintains that he has the ability to parent. Prior to addressing these contentions, we must examine principles concerning our review and those which govern termination generally.

■ Appellate review of parent-child termination proceedings is de novo. *In re K.L.C.*, 372 N.W.2d 223, 227 (Iowa 1985). On review, especially when considering the credibility of witnesses whom the trial court heard and observed firsthand, the appellate court gives weight to the fact findings of the trial court, but is not bound by them. Iowa R. of App.P. 14(f)(7); *In Interest of Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

The paramount consideration is that each child shall receive what will best serve the child's welfare and the best interest of the state. § 232.1; *In Interest of J.H.R.*, 358 N.W.2d 311 (Iowa 1984). In *Dameron* we stated:

> Central to a determination of this nature are the best interests of the child. In this connection, we look to the child's long-range as well as immediate interests. Hence, we necessarily consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*Dameron*, 306 N.W.2d at 745 (citations omitted).

In addition, the legislature required consideration of the family unit by prescribing a strong preference for the child to remain in the family home. §§ 232.1, 232.102(3), 232.116(5)(c). If that is not feasible, our statutory scheme provides a rehabilitatory period for the parent, requiring a plan and efforts to return the child to the child's home. § 232.102(5). This interest is not absolute and is subordinate to the best interest of the child. The state has the duty to intervene and seek termination when the parent is unable to provide the child proper care and treatment. *In Interest of A.C.*, 415 N.W.2d 609, 613–14 (Iowa 1987).

The court of appeals reviewed the record and disagreed with the trial court's determination that the State established by clear and convincing evidence that the children will suffer harm. It pointed to the father's employment and housing stability and his interest in the children, concluding that "[t]here is not clear and convincing evidence the children cannot be returned to the father." We only disagree with the quoted conclusion.

Our review of the facts favor the disposition made by the trial court. The trial court was in a position to see and observe the witnesses and determine their credibility. The findings of fact in this case depend to a great extent on the credibility of the social workers and the father. We also note that the guardian ad litem and attorney for the children have joined in the application for further review and request the juvenile court order of termination be affirmed.

We believe that the court of appeals placed a greater emphasis on the parent's rights than the interest of the children. While our public policy pursuant to statute dictates the presumption that the child's best interest is served by allowing the child to reside with a parent, this presumption may be overcome. In this case we believe that the evidence on the part of the State did just that by clear and convincing evidence.

It is undisputed that the father's physical abuse of his son caused the commencement of these proceedings and contributed to the initial placement of these children in foster care for over three years. While the injuries were not severe, such injuries point to an inadequate parent who has inflicted a continued, inappropriate and dangerous punishment upon a two-year-old child. The ultimate question is whether that past performance is indicative of what we may expect in the future. The father was treated and counseled. He received inpatient psychiatric care in 1984. A written report in 1984 from the psychiatrist indicates that the father "has severe emotional problems and is extremely dependent, is unrealistic and emotionally unprepared to deal with the stresses of life." In April of 1986, he was tested and evaluated by a licensed clinical psychologist with a Ph.D. who practices with a private psychiatric group. This evaluation indicates as follows:

> [The father] appears to be an individual of average intelligence who seems to fulfill the criteria of Schizotypal Personality Disorder. He stated that at times he becomes quite frightened because he feels that others can read his thoughts. He stated that at times this is almost a constant fear in that he is unable to think in private. This type of paranoid ideation does not seem to be of the extent of a full blown psychotic delusion and there-

fore is more consistent with a schizotypal disorder.... He stated on the Sentence Completion test that people think of him as strange and that was okay because he did not understand other people either. He does not appear to be a violent individual from this testing. However, because of his developmental history he would be one that would be more acceptable to possibly violent discipline and not feel remorseful because of it. He does not appear to have an impulse control disorder and therefore these would probably not be explosive outburst but situations that he saw as appropriate.

His eccentricities of behavior, thought, and perception would not be easily affected by any type of treatment. Only long term psychotherapy, if he was so motivated would have some impact on these areas. By definition, such a disorder is characterized by an impoverished social life, a distancing from close interpersonal relationships, and an autistic, but nondelusional, pattern of thinking.... Few schizotypal individuals are motivated to sustain therapeutic relationships and left to their own devices will isolate themselves increasingly from social activities.

Perhaps the most disturbing portion of the psychologist's evaluation concerns the father's attitude on his past use of physical force. The report states:

> During the interview, [the father] never admitted to inflicting any physical harm on the children "that was undeserving." He showed no particular remorse for any of his behavior. In talking with him, it seems as if he pretty much follows the wind and what other people suggest of him rather than being responsible for his own behavior.

If the psychologist has correctly evaluated the father's present attitude, the father fails to realize that the excessive physical punishment he administered to his son was wrong. This attitude could indicate future similar performances if he were to regain custody of these children.

On the other hand, the father has made a concerted effort to regain custody of his children by availing himself of the offered services. Despite this effort, however, he has been unable to acquire adequate parenting skills. He has shown little success in implementing the suggestions of the homemaker and of the social workers. When he took his parenting classes, the other members indicated that he has not done well in class and was hostile toward the homemaker's recommendations on parenting. It was reported that he made inappropriate answers to many of the hypothetical problems. He suggested in class that one handle children by tieing their hands together, tieing up one child while he took the other child to the bathroom and hiding toys that were not picked up. His response to a homemaker was that "kids are like dogs, you have to train them."

The father's home also was not in a sanitary condition. On visits, the social workers found dog feces in the house and on the steps, cockroaches throughout the house, and the dwelling to be generally dirty and permeated by an odor.

We believe that it would be inappropriate to decide this important issue based only on the condition of the father's home, his intelligence or lack thereof and his homemaking skills. Many good parents lack some or most of these skills. However, these matters are considered in arriving at our total evaluation of whether the parent can provide the children proper care and treatment.

More important is the danger to the children. The father has physically abused the children on at least two occasions. He does not appear to be remorseful or understand that his actions were completely inappropriate. Both department caseworkers opined that the children would be in danger if they were returned to the father at this time. The record justifies their opinion. We find their testimony credible.

We agree with the trial court that these children "await some type of permanency in their lives." The father and the department have tried to correct the deficiencies which caused these children to be removed from the parental home, perhaps for too long. "Children should not be made to

suffer indefinitely in parentless limbo." *In Interest of A.C.*, 415 N.W.2d at 613. Despite this effort, we find that the State has established by clear and convincing evidence the grounds for termination. The required proof shows that the children cannot be returned to their father and still be protected from physical abuse or some other harm. The interest of the children demand that the parental rights be terminated.

We vacate the decision of the court of appeals. The trial court is affirmed. DE-CISION OF COURT OF APPEALS VA-CATED; JUDGMENT OF DISTRICT COURT AFFIRMED.